UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CEDRIC E. WILLIAMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:16 CV 756 RWS |
| ) | |
| UNITED PARCEL SERVICE, INC., ) | |
| ) | |
| Defendant. ) | |

# **MEMORANDUM AND ORDER**

Plaintiff Cedric Williams is employed by Defendant United Parcel Service, Inc. (UPS). In 2013, Williams was demoted from his position as a District Labor Manager. In his amended complaint, Williams asserts that his demotion was motivated by unlawful discrimination based on his race. He also asserts he was demoted in retaliation for participating protected activities in relation to alleged employment discrimination directed at two other UPS employees. UPS has moved for summary judgment. Because Williams has failed to establish his claims of employment discrimination I will grant UPS summary judgment.

*Legal Standard*

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law.  Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998)(citing Fed. R. Civ. P. 56(c)).  The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof.  Id. at 324.  In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy.  Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

    Direct evidence of employment discrimination is rare, therefore, most cases rely on circumstantial evidence.  In the absence of direct evidence of discrimination, courts employ the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)(Title VII case).[1]

---

[1] Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1196 (8th Cir. 2006) (The McDonnell Douglas burden-shifting framework is also used in analyzing race discrimination claims pursuant to 42 U.S.C. § 1981).

Under the burden-shifting analysis, the plaintiff must first establish a prima facie case of intentional discrimination. McDonnell Douglas, 411 U.S. at 802; Bashara v. Black Hills Corp., 26 F.3d 820, 823 (8th Cir. 1994). If the plaintiff establishes a prima facie case, a presumption of discrimination is established and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. 411 U.S. at 802. The defendant need not persuade the court that the articulated reason was the basis of the employer's action; rather, it must simply provide some evidence of a non-discriminatory reason or reasons for its action. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993).

Upon the proffer of such evidence, the presumption of discrimination established by the prima facie case "simply drops out of the picture." Id. at 510-11. The burden then shifts back to the plaintiff to prove that the reason articulated by the employer was really a pretext for discrimination. Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1316 (8th Cir. 1995). A rejection of the employer's proffered non-discriminatory reason by itself or combined with elements of the prima facie case may be enough to establish, but does not compel, an inference of intentional discrimination. St. Mary's Honor Center, 509 U.S. at 511.

The burden of proving discrimination remains on the plaintiff at all times. Id. at 515-16. It is not enough to merely discredit defendant's articulated reason for the adverse employment action. A plaintiff must always establish that the real reason for defendant's action was impermissible discrimination. Id.; see also Huston v. McDonnell Douglas Corp., 63 F.3d 771, 777 (8th Cir. 1995). To avoid summary judgment, a plaintiff must present evidence that, when viewed in its entirety: (1) creates a fact issue as to whether the employer's proffered reason is pretextual, and (2) creates a reasonable inference that a discriminatory motive was a determinative factor in the adverse employment decision. Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996).

***Background***

The following background information is taken from Defendant UPS's Statement of Undisputed Material Facts and from Williams' response and UPS's reply thereto [Doc # 62][2] and from the record in this matter.

Most of UPS's hourly employees are members of the International Brotherhood of Teamsters labor union (Teamsters or Union). The Teamsters and UPS are parties to a master collective bargaining agreement that covers all

---

[2] A close reading of UPS's Statement of Undisputed Material Facts and Williams' responses thereto shows that the statements are all admitted. When Williams asserts that a stated material fact is denied, he does not address the specific fact expressed. Instead, he submits additional statements which are unsupported by citations to the record in violation of Local Rule 7-4.01(E) or if supported by citation, the citation is often inaccurate or misleading. Moreover, many of Williams' responses include information which is immaterial to the issues in this case.

Teamster represented UPS employees in the United States. In addition, supplemental agreements are negotiated in various regions. The master agreement and supplemental agreement make up the union contract for each region. The union contract provides for the resolution of grievances that union employees raise. A grievance is defined as "any controversy, complaint, misunderstanding, or dispute," regarding the union contract. [Doc. # 50, Gough Decl. Ex. F ¶ 9] The first step in the grievance procedure requires a union steward and a UPS supervisor to meet and attempt to resolve the grievance. If the grievance is not resolved, the Union and UPS conduct a local hearing to attempt a resolution. If that process fails, the grievance is submitted to a panel of an equal number of UPS and Teamster representatives. The panel receives documents, testimony, and argument and votes to reject, uphold, or deadlock the grievance.

Plaintiff Cedric Williams is a black male who has been employed by UPS since 1987. From 2004 until his demotion in 2013 Williams was a District Labor Manager. As a District Labor Manager for the State of Arkansas, Williams "was responsible for preparing case briefs and representing UPS in all grievances presented to the panel for the State of Arkansas." [Id. at ¶ 13] Williams "generally had the authority to resolve grievances at the local level or panel unless ordered otherwise." [Id. at ¶ 14] Williams was also tasked with helping to "identify

recurring contract violations and to take steps to try to ensure that UPS generally adhered to its contractual obligations." [Id. at ¶ 14]

Williams had a dual reporting role in which he reported to a Regional Labor Coordinator, Richard Gough, as well as to the District President, Judy Henry. Gough supervised Williams on a day-to-day basis. Only two other District Labor Managers reported to Gough, Bill Margave who was responsible for the State of Missouri and Jerry Wassel who was responsible for the State of Kansas. Williams was the only one of the three District Labor Managers who operated under the regional Southern Conference union contract. Gough, in turn, reported to the Regional Labor Manager Headley Chambers.

Gough visited Williams in Little Rock Arkansas in January 2011. Gough concluded that Williams "was not following basic UPS labor practices" and began "working with Williams to implement certain labor practices." [Id. at ¶ 14] Gough helped Williams create a grievance log that would help Williams identify which grievances were the most common, which operations generated the most grievances, how long grievances were pending, and amounts paid to settle grievances. [Id. at ¶ 16] On May 18, 2011, Gough sent Williams an email expressing serious concerns with Williams' ongoing failure to address "9.5" hours

of work grievances. [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 3][3] Gough felt that the Division Managers did not respect Williams. [Id. at ¶ 4][4] Gough told Williams to involve District President Judy Henry if the Division Managers did not help solve the 9.5 problem. [Id.]

On June 9, 2011, Gough sent an email to his district labor managers, including Williams, asking them to provide information about four separate labor issues. The email informed these managers that the responses were needed by a firm date and time to allow Gough to compile a report for Mike Rosentrater, a high-level UPS labor manager. [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 5][5] Forty-five minutes after the deadline Williams sent Gough a two-line response

---

[3] Williams' response to this undisputed statement of fact is representative of many of Williams' responses. His response presents information which is not supported by any citations to the record and the sole citation recited applies to an issue which is not relevant to the issues in this case.

[4] Williams' reply to this statement of fact does not deny that Gough *felt* that Division Managers did not respect Williams. Instead, Williams declares that "not a single Division Manager" would say that Williams was not respected. To support this proposition Williams cites to four depositions and one affidavit. The affidavit [Pl.'s Ex. 6] is made by a union steward and not by a Division Manager. For three of the depositions, Williams merely cites to the depositions as a whole and does not offer where in the depositions his assertion is supported. Such designations fail to meet the specificity requirements of Fed. R. Civ. P. 56(c)(1)(A). See Crossley v. Georgia-Pac. Corp., 355 F.3d 1112, 1114 (8th Cir. 2004) (A district judge is not required to sift through a deposition looking for facts which support a claim.) However, I have looked through these depositions. The first [Pl.'s Ex. 4] is of Armour Bryant. He states that he is a business manager in Texarkana. He never states that he was a Division Manager during Williams' employment as a labor manager. Although Bryant testified that he thought Williams had done a good job he never addresses whether Williams was respected by Division Managers. The second deposition [Pl.'s Ex. 5] is of Tim Nichols. He is a president of the local union, not a Division Manager. The third deposition [Pl.'s Ex. 6] is of David Eusanio, a Division Manager. When asked if he had any criticism of Williams as a labor manager, Eusanio said, "No." He was not asked about whether Williams was respected. Finally, the fourth deposition [Pl.s Ex. 8] is of Naaman Kelley. He is the Transportation Division Manager for the State of Arkansas. Williams currently works for Kelley as his transportation dispatch manager. Williams cites to this deposition to page 110, lines 16-24. At that cite Kelley testified that he rated Williams' performance as a dispatch manager as "fully acceptable." That means Williams was doing the basic job that was expected of him. [Id. at p. 111] Nothing in this section addresses whether Williams was respected by Division Managers.

[5] Williams admits this statement then offers a further response which is unsupported by citation to the record in violation of Local Rule 7-4.01(E).

which addressed only one of the four issues. The next day, Gough emailed Williams expressing incredulity at Williams' incomplete response and directing Williams to provide a complete response that day. [Id. at ¶ 6][6] On June 17, 2011, Gough sent an email to his District Labor Managers reminding each manager to provide the details of union activities on a day the Teamsters called "ITB Day of Action." Williams filed a brief reply stating only that all went well in his district. Apparently frustrated with this limited response, Gough emailed Williams asking, "Were they there? What did they do? Come on C!!" Williams then responded with more details. [Id. at ¶ 7] In July 2011, Gough again visited Arkansas to work with Williams. After their meeting Gough asked Williams to create a written memo of their conversation to assure Gough that Williams understood what was expected of him in his job. In his memo Williams committed to: preparing panel briefs once a case was deadlocked at a local hearing; keeping his grievance log up to date; acknowledging that supervisor working grievances "must stop;" and to involving operations managers and district managers to avoid those grievances . [Id. at ¶ 9] Gough reviewed with Williams the processes for the preparation of grievances and asked Williams to send drafts of case briefs prior to panel hearings to allow Gough to review them and make suggestions.

---

[6] Williams admits this statement then offers a further response which is unsupported by citation to the record in violation of Local Rule 7-4.01(E). This pattern continues for all of the uncontested facts.

Gough had Williams send his grievance log to Gough which Gough regularly audited. On September 19, 2011, Gough sent Williams an email pointing out various concerns based on the audits of his grievance logs and told Williams, "I need to see drastic improvements on these items Cedric as well as those we have spoken to in the past." [Id. at ¶ 11] During a visit in October 2011, Gough discussed ongoing performance issues with Williams. Gough told Williams there must be progress in Williams' performance issues within the next month or that further action would be required. [Doc. # 50, Gough Decl. Ex. F ¶ 28] In November 2011, Gough noted numerous old discipline cases still not resolved and Williams did not appear to be using the grievance log to schedule local hearings. Gough also noted that Williams was not submitting briefs in a timely manner to allow Gough to review the briefs before panel hearings. [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 12]

On March 2, 2012, Gough emailed Williams with a list of performance concerns. Williams responded to some concerns but not others. On March 9, 2012, Gough resent his email with additions comments including, "I'm sending you this again as I have not received answers on most of the questions. If you think I am taking my time to do this only for enhancing my typing skills, you are sadly mistaken." [Id. at ¶ 13, Doc. # 50, Ex. T] By March 13, 2012, Gough and

his supervisor, Headley Chambers, decided that a more formal plan was needed to improve Williams' job performance issues. They decided to put Williams through the MPIP[7] process. Gough was told to call Stan Roux, the Human Resources Director for Gough's district for details regarding the MPIP process. Gough had never met Roux before. His call to Roux was the first time Gough spoke to Roux. [Doc. # 50, Gough Decl. Ex. F ¶ 32] Roux provided Gough with the MPIP paperwork. Roux did not have any input to the issues or goals Gough drafted in Williams' MPIP. [Id. at ¶ 38]

On April 9, 2012, Gough and Roux met with Williams to present the MPIP and go over the needed improvements. On May 29, 2012, Gough and Roux met again with Williams for the first MPIP progress report. Gough noted that Williams had failed to meet the communications goal with Henry; still had issues with grievances; and failed to meet Gough's expectations regarding case preparation. [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 17] In June 2012, Gough reviewed Williams' grievance files and found that they did not contain the basic information needed to prepare case briefs and to represent UPS at panel hearings scheduled in July.

On September 26, 2012, Gough and Roux met with Williams for the second MPIP progress report. Gough concluded that Williams still failed to communicate

---

[7] A MPIP is a management performance improvement plan.

effectively with Henry; failed to update the grievance log; failed to complete case preparations for panel hearings on a timely basis; and failed to resolve underlying problems leading to continued grievance payouts. [Id. at ¶ 20] On February 7, 2013, Gough and Roux presented Williams with the third MPIP progress report. On February 11, 2013, Gough and Roux met with Williams. Gough told Williams that Gough and Chambers had decided to demote Williams out of the District Labor Manager position because Williams did not make sufficient progress in meeting the goals of the MPIP. [Id. at ¶ 22] After Gough and Chambers decided to demote Williams, it was up to Roux to find Williams a new position. Although there were no vacant management positions in UPS's feeder group, Roux arranged for Williams to work as a Feeder Dispatch Manager at the Little Rock, Arkansas facility beginning February 13, 2013. Williams' demotion did not result in a reduction of salary but did involve fewer incentive opportunities.

After Williams' demotion, Don Lewick temporarily assumed the position of Arkansas District Labor Manager. Lewick resigned after being diagnosed with cancer. Bret Holladay, a white male, succeeded Lewick as the District Labor Manager in March 2014. [Doc. # 59, Holladay Dep., Ex. 11 at p. 7] Judy Henry left her position as District President right after Holladay became the District Labor Manager. [Id. at 59] Gough never supervised Holladay. [Id. at 67] On

October 21, 2017, the date of Holladay's deposition, his supervisor was Stokes Nelson. [Id. at 24] Holladay's managers have not had any significant issues with Holladay's communications, processing of grievances, preparation for panels, or his work with staff or managers in Arkansas. [Doc. # 50, Nelson Decl., Ex. LL]

Williams filed this 42 U.S.C. § 1981 lawsuit alleging that he was demoted in retaliation for engaging in the protected activities of being deposed in an employment discrimination lawsuit brought by UPS employee Napoleon Sandeford and for Williams' participation in employment issues with UPS union employee Rodney Barefiled. Williams also alleges that his demotion was based on his race. UPS has moved for summary judgment. Williams opposes the motion.

***Discussion***

*Williams' retaliation claim*

In order to establish a prima facie case of retaliation, Williams must demonstrate that (1) he engaged in protected activity, (2) subsequently a materially adverse action was taken against him by supervisors, and (3) the materially adverse actions were causally linked to his protected activity. Ellis v. Houston, 742 F.3d 307, 322 (8th Cir. 2014). Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a

genuine factual issue on retaliation. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999).

*Napoleon Sandeford's lawsuit*

Although the record alludes to a lawsuit brought by Napoleon Sandeford, including the parties' briefs, the exact details of Sandeford's suit is unclear. Williams' amended complaint asserts that Sandeford filed a lawsuit against UPS for illegal race and disability discrimination. Williams alleges that he participated in a protected activity by providing a deposition in the Sandeford case. Williams alleges that shortly after this deposition he was summoned to St. Louis Missouri by Human Resources Manager Stan Roux and was demoted.

In an attempt to establish a prima facie case, Williams seeks to widen the group of individuals who were the ultimate decision-makers in his demotion by asserting that Roux was *the* ultimate decision-maker. Williams argues that Roux was aware of Williams' deposition and then decided to demote him in retaliation for his testimony. In support of this proposition, Williams cites "Exhibit A at P.10." [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 14 Pl.s Resp.] Exhibit A is a declaration made by Roux. There is no page 10. Paragraph 10 states, "After Gough and Chamber's decided to demote Williams, [Roux] had to determine where to place Williams within UPS." This statement does not support the

proposition that Roux was the decision-maker.  In another section of Williams' responses to UPS's statement of undisputed facts, Williams cites to Roux's deposition. [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 1 Pl.s Resp.]  Roux states in his deposition that terminations of UPS managers are "managed by the HR manager along with consulting district managers, region, attorneys." [Doc. # 59, Roux Dep., Ex. 1 at 10]  Roux affirmed that not a single employment decision is made at UPS without involving the HR department.  [Id.]  Neither of these statements supports the proposition that Roux was the decision-maker in Williams' demotion.

Williams also claims that District President Judy Henry deferred to Roux.  In support of this proposition, Williams cites to Henry's deposition, "Exhibit 2 at P.89:1-15."  [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 1 Pl.s Resp.]  But Williams did not include page 89 as part of his exhibit. However, UPS did provide that page of Henry's deposition in reply to Williams' assertion.  Henry stated in her deposition that she relied on Gough and Chambers (along with Roux's HR guidance) in signing-off on Williams' demotion.  [Doc. # 62, Henry Dep., Ex. E -1 at pp. 88-89]  This statement does not establish that Henry *deferred* to Roux.

Finally, Williams claims that Roux admitted that he had veto authority over Henry's employment decisions.  [Doc. # 62, Def.'s Statement of Mat. Facts at ¶ 1

Pl.s Resp.]  In support of this proposition Williams' cites to Roux's deposition regarding the employment decision of another UPS employee, Chris Schaffhauser. Williams' counsel asked, "But are you telling me that you exercised veto authority over Judy Henry."  Roux replies, "I did, yes." [Doc. # 59, Roux Dep., Ex. 1 at p. 34]  But Roux immediately corrects this statement stating, "Not – not authority, Luther.  I – I disagree."  [Id.]  He states that if he disagreed with Henry he would discuss the matter with Henry and offer different things to consider and provide her with advice.  [Id. p. 34-35]  Williams' assertion that Roux admitted he had veto authority over Henry is, at best, misleading.  Moreover, there is no evidence that Henry was the decision-maker in demoting Williams.

    Nor does Williams' deposition in the Sandeford matter establish a prima facie claim of retaliation.  Gough started working with Williams to improve his job performance starting in January 2011.  After Williams failed to make sufficient progress in 2011, Gough placed Williams on a MPIP on April 9, 2012.  Williams was deposed in the Sandeford matter on March 14, 2012.  Williams was not demoted until February 2013.  Gough never had knowledge of Williams' participation in the Sandeford lawsuit and never learned of the substance of Williams' deposition in that matter.  Furthermore, Williams' deposition testimony was not adverse to UPS.  After the deposition, UPS counsel sent UPS management

Pl.s Resp.]  In support of this proposition Williams' cites to Roux's deposition regarding the employment decision of another UPS employee, Chris Schaffhauser. Williams' counsel asked, "But are you telling me that you exercised veto authority over Judy Henry."  Roux replies, "I did, yes." [Doc. # 59, Roux Dep., Ex. 1 at p. 34]  But Roux immediately corrects this statement stating, "Not – not authority, Luther.  I – I disagree."  [Id.]  He states that if he disagreed with Henry he would discuss the matter with Henry and offer different things to consider and provide her with advice.  [Id. p. 34-35]  Williams' assertion that Roux admitted he had veto authority over Henry is, at best, misleading.  Moreover, there is no evidence that Henry was the decision-maker in demoting Williams.

Nor does Williams' deposition in the Sandeford matter establish a prima facie claim of retaliation.  Gough started working with Williams to improve his job performance starting in January 2011.  After Williams failed to make sufficient progress in 2011, Gough placed Williams on a MPIP on April 9, 2012.  Williams was deposed in the Sandeford matter on March 14, 2012.  Williams was not demoted until February 2013.  Gough never had knowledge of Williams' participation in the Sandeford lawsuit and never learned of the substance of Williams' deposition in that matter.  Furthermore, Williams' deposition testimony was not adverse to UPS.  After the deposition, UPS counsel sent UPS management

Pl.s Resp.]  In support of this proposition Williams' cites to Roux's deposition regarding the employment decision of another UPS employee, Chris Schaffhauser. Williams' counsel asked, "But are you telling me that you exercised veto authority over Judy Henry."  Roux replies, "I did, yes." [Doc. # 59, Roux Dep., Ex. 1 at p. 34]  But Roux immediately corrects this statement stating, "Not – not authority, Luther.  I – I disagree."  [Id.]  He states that if he disagreed with Henry he would discuss the matter with Henry and offer different things to consider and provide her with advice.  [Id. p. 34-35]  Williams' assertion that Roux admitted he had veto authority over Henry is, at best, misleading.  Moreover, there is no evidence that Henry was the decision-maker in demoting Williams.

Nor does Williams' deposition in the Sandeford matter establish a prima facie claim of retaliation.  Gough started working with Williams to improve his job performance starting in January 2011.  After Williams failed to make sufficient progress in 2011, Gough placed Williams on a MPIP on April 9, 2012.  Williams was deposed in the Sandeford matter on March 14, 2012.  Williams was not demoted until February 2013.  Gough never had knowledge of Williams' participation in the Sandeford lawsuit and never learned of the substance of Williams' deposition in that matter.  Furthermore, Williams' deposition testimony was not adverse to UPS.  After the deposition, UPS counsel sent UPS management

an email stating that Williams "did a good job at the deposition" and that Williams' testimony "did not harm UPS's defenses in this case." [Doc. # 59, Ex. 10, UPS-CW 4799 and 4801] Based on the foregoing, Williams fails to establish a prima facie case of retaliation based on his deposition in the Sandeford case.

*Rodney Barefield allegations*

The details about Williams' involvement with Rodney Barefield are even scanter in the record than the details of the Sandeford lawsuit. Barefield states in his affidavit that he was a union member at UPS from 1989 until 2017. He states that he filed more personal grievances that anyone else at UPS. He filed one almost every day. [Doc. # 59, Pl.'s Resp. to Mot. for Summ. J., Ex. 6, Barefield Aff.] Barefield states that from 2010 forward, he repeatedly filed grievances alleging racial discrimination and retaliation. [Id.] At some unspecified date in 2011, Williams claims that he refused to terminate Barefield because it would violate the union contract and be "racially discriminatory." [Doc. # 59, Pl'.s Resp. to Mot. for Summ. J., Ex. 12, Williams Aff.] He declared that "[b]ecause Barefield had filed grievances alleging race discrimination, Stan Roux characterized him as a troublemaker who played the race card." [Id.][8] In his deposition, Williams states that Barefield was a "race-baiter. He used the race card all the time." [Doc. # 62,

---
[8] The record does not identify the date that Roux is alleged to have made this remark. Williams attempts to use this statement to establish that Roux was racially biased and engaged in race discrimination against Williams. Roux's alleged statement does not create an inference that Roux engaged in race discrimination. Moreover, Williams agrees with Roux's assertion that Barefield played the race card.

Def.'s Statement of Mat. Facts, Df.s Reply., Ex. C-1at p. 96] Williams never told anyone in management that they were discriminating against Barefield. [Id. at 107] But he did try to "get them to understand we have to do it the right way." [Id.] Williams stated that if someone was going to get discharged, no matter what their color was, it must be done in the same way. [Id. at 108]

    This is the total extent of the evidence in support of Williams' claim he was demoted in retaliation for the Barefield matter. Williams does not provide any more information about this incident. This thin allegation does not support William's claim for retaliation for two reasons. First, the Barefield incident occurred in 2011. Williams was not demoted until 2013. The Barefield incident, whatever it was, is too remote in time to support Williams' claim. Moreover, Williams admits in his deposition that the incidents that give rise to his retaliation claim began after the Bradfield incident. In his deposition Williams unequivocally states that the retaliation process started when he gave his deposition in the Sandeford case in March 2012. [Id. at 24]

    Even if Williams established a prima facie case of retaliation discrimination, UPS has articulated a legitimate, non-discriminatory reason for Williams' demotion. Gough worked with Williams throughout 2011 and 2012 in an attempt to improve Williams' job performance. In 2013, Gough and Chambers decided

that Williams should be demoted. Although Williams' disagreed with Gough's performance evaluations, such disagreements do not support a claim for retaliation. As a result, I find that UPS is entitled to summary judgment on this claim.

*Williams' disparate treatment* claim

In his amended complaint Williams' asserts a disparate treatment claim based on race discrimination under 42 U.S.C. § 1981. To establish a prima facie case for a disparate treatment claim, Williams must show that: (1) he is a member of a protected class; (2) he was meeting the legitimate expectations as to his duties; (3) he suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination because similarly situated employees, who were not members of the protected group, were treated differently. <u>Gilooly v. Missouri Dept. of Health and Senior Services</u>, 421 F.3d 734, 737-739 (8th Cir. 2005).

As an African American, Williams is a member of a protected class. It is undisputed that he suffered an adverse employment action when he was demoted. But Williams fails establish the two remaining factors of a prima facie case of race discrimination. It is undisputed that Williams was not meeting the legitimate expectation as to his duties. Williams was counseled by Gough throughout 2011. He was eventually placed on a MPIP by Gough and Chambers in 2012. Williams was ultimately demoted in 2013 based on his inability to meet the goals of the

MPIP.

Williams has not identified a similarly-situated employee, who is not a member of a protected class, who was treated more favorably. Williams attempt to compare his performance with Bret Holladay, the individual who became the District Labor Manager in Arkansas a year after Williams was demoted. However, Williams and Holladay were not similarly-situated because they did not work for the same supervisors. Bennett v. Nucor Corp., 656 F.3d 802, 819 (8th Cir. 2011) ("In a case involving allegations of discriminatory disciplinary practices, for example, this court explained that to be similarly situated, the comparable employees must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances.") (internal quotations and citation omitted). Nor did Holladay have the same type of long term performance deficiencies that Williams had before he was demoted.

Even if Williams established a prima facie case, UPS has come forward with a legitimate, non-discriminatory reason for Williams' demotion. At this point the presumption of discrimination established by a prima facie case "simply drops out of the picture." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 510 (1993). Williams has failed to present evidence that UPS's grounds for Williams'

demotion was a pretext and Williams' evidence fails to create a reasonable inference that a discriminatory motive was a determinative factor in his demotion. As a result, I find that UPS is entitled to summary judgment on this claim.

Accordingly,

**IT IS HEREBY ORDERED that** Defendant United Parcel Service, Inc.'s motion for summary judgment [49] is **GRANTED**.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 30th day of November, 2018.